# CRIMINAL CASES.

## Richmond.

### O'Boyle v. Commonwealth.

#### December 5, 1901.

1. CRIMINAL LAW—*Murder—Indictment as at Common Law.*—On an indictment for murder in the usual common-law form, the accused may be found guilty of murder of the first degree, or of the second degree, or of manslaughter. The statute creating two degrees of murder did not necessitate any change in the form of the indictment.

2. CRIMINAL LAW—*Felony—Continuance—Absence of Prisoner.*—Where the prisoner is not prejudiced, it is not error to continue an indictment against him for a felony in his absence.

3. CRIMINAL LAW—*Venireman—Voir Dire—Presumption of Prisoner's Innocence.*—It is not error to refuse to permit a venireman, on his *voir dire*, to be asked if he can go into the jury-box presuming the prisoner innocent until his guilt is proved by the evidence, where substantially the same question is asked him by the court in another form.

4. CRIMINAL LAW—*Homicide—Relations of Deceased and Prisoner—Motive.*—In cases of homicide, where the *corpus delicti* has been proved, it is competent to show the relations of the accused and the deceased, and their state of feeling and course of conduct toward each other. Such evidence is received for the purpose of showing the motive and intent with which the act charged was done. The admissibility of such evidence is not determined by the length of time intervening between the threat, or act proved, and the homicide under investigation, but the weight to be attributed to it by the jury will be in proportion to the proximity of time, and the directness of its connection with the principal fact under consideration.

5. CRIMINAL LAW—*Dying Declarations—Foundation—Purpose—Weight.*—Declarations made under a sense of impending death of the de-

clarant, without any hope or expectation of recovery, are received
to identify the party committing the homicide, to establish the cir-
cumstances of the *res gestæ*, or to show the transactions from which
the death of the declarant results, and are entitled to the same
weight as if made under oath.

6. CRIMINAL LAW—*Dying Declarations—Signed and Unsigned—Estoppel.*—
Where a signed dying declaration has been excluded on the motion
of the prisoner, he will not be heard to object to the introduction of
evidence of a verbal declaration for which a proper foundation has
been laid.

7. EVIDENCE—*Pain—Narration of Cause—Case at Bar.*—Whenever mate-
rial to the issue, the natural expression of present physical pain is
competent evidence as a part of the *res gestæ*, but everything in the
nature of a narration of past occurrences must be excluded.
Declarations made by the deceased about 11 o'clock in the morning,
while suffering physical pain, to the effect that she had hurt herself
by falling against a bed-post that morning, are not admissible as
parts of the *res gestæ* on the trial of her paramour for an assault
upon her in the evening of that day resulting in her death.

Error to a judgment of the Corporation Court of the city of
Newport News, rendered October 31, 1900, whereby the plain-
tiff in error was sentenced to be hanged for murder of the first
degree.

*Affirmed.*

The opinion states the case.

*C. H. Ruth* and *C. C. Mitchell*, for the plaintiff in error.

*Attorney-General A. J. Montague*, for the Commonwealth.

KEITH, P., delivered the opinion of the court.

Plaintiff in error was convicted of murder in the first degree
in the Corporation Court for the city of Newport News, and the
case is before us upon certain exceptions taken to the rulings of
the court during the progress of the trial.

The first contention of plaintiff in error is, that the indict-
ment was insufficient to warrant the verdict of murder in the

first degree. It is in the usual common law form of an indictment for murder. The question sought to be raised was fully considered in *Livingston's Case*, 14 Gratt., at page 596. Numerous authorities from this and other courts were there discussed, and it was the unanimous judgment of the court that under such an indictment the prisoner might be found guilty of murder in the first or second degree, or of manslaughter. *Cluverius* v. *Commonwealth*, 81 Va. 787; *Kibler* v. *Commonwealth*, 94 Va. 804.

It is assigned as error in the petition that the case was continued at the July term, 1899, and again at the September term, 1899, in the absence of the petitioner. The trial at which he was convicted took place on the 30th day of October, 1899, and the prisoner was not, in our judgment, prejudiced by continuances of the case prior to that date.   .

The fourth error assigned in the petition covers a number of points reserved in the record by bills of exceptions. When the jury were being selected, the prisoner by counsel propounded to S. S. Lear the following interrogatory: "Can you go into the jury box presuming the prisoner innocent until he is proven guilty by the evidence?" The attorney for the Commonwealth objected to this question, the court sustained the objection, and in lieu thereof instructed the venireman that the law presumes every man charged with the commission of a crime innocent until proven guilty, and asked "said venireman whether he could serve upon the jury in this case, giving the prisoner the full benefit of this presumption, to which the venireman answered that he could." We think the question excluded and the one propounded are substantially identical, and that the change in form could not have been prejudicial to the prisoner.

The Commonwealth introduced Carry Clayton as a witness on its behalf, and asked her the following question: "Did you know Alma Hamilton, and were you at her house on the 2d day of June, and if so, what took place at Alma's house on that

day?" To which interrogatory the witness answered: "I knew Alma Hamilton; she was a colored woman. I was at Alma Hamilton's house on the 2d day of June, 1899. Alma was drinking that afternoon, and Mrs. Godsey said." (Here the prisoner, by counsel, objected to witness making any statement of what Mrs. Godsey said as being hearsay, and therefore not admissible, unless a part of the *res gestæ* or connected in point of time with the offence charged in the indictment; whereupon the court overruled the objection and allowed the witness to continue and the answer to go to the jury.) The witness continuing, said: "Lucy Hubbard and Mrs. Godsey said they would tell Billie (meaning William O'Boyle) Alma was drinking, when the doctor had ordered her not to drink on account of the baby. And Alma said, 'Tell him,' and stuck her head out of the window and yelled to some colored man, 'Tell Billie I am drinking, and drinking like hell,' " which answer as well as the question was objected to by the prisoner through his counsel, who moved that the answer be stricken out and not be allowed to go to the jury, as it failed to show that the prisoner was present, or that the conversation was ever communicated to him, or to show any motive for the commission of the crime charged in the indictment, which objection was overruled.

It appears from the testimony of the prisoner, who was a witness in his own behalf, that this conversation was communicated to him, in substance, at least.

Another objection was to a question asked the same witness: "What relationship existed between William O'Boyle and the deceased, Alma Hamilton?" The court overruled the objection, and stated to the jury that the evidence was not admitted to show immoral character, but to show relationship and as explanatory of the parties' conduct toward each other, and to show motive. The answer given by the witness was:

"They lived together as man and woman; they lived just as a man and wife would do."

We are of opinion that the evidence was properly admitted.

The same witness was asked: "Who claimed to be the father of Alma Hamilton's baby?" The prisoner objected to this question as calculated to prejudice the minds of the jury and tending to prove the immoral character of the prisoner. The court overruled the objection for the reason assigned by it with respect to the objection of which we have just disposed, and there was no error in the ruling.

The same witness was asked: "Did they ever have any difficulty before (meaning the deceased and the prisoner at the bar), and what were the nature of those difficulties, if they had any?" To which question the prisoner objected as tending to prove a separate and distinct offence unless shown by the Commonwealth to be connected in point of time with the offence charged in the indictment; but the court overruled the objection and instructed the jury "that evidence of antecedent difficulties was not admitted to show that because they had had difficulties before they had the one which is the subject of this investigation, but to show motive and the relation of the parties to each other."

The witness answered: "Yes, sir; I saw them have a difficulty a good while before this. He kicked her and beat her once when she lived at my sister's house last year." To which question and answer the prisoner, by counsel, objected, which objection the court overruled.

In *Commonwealth* v. *Goodwin*, 14 Gray, 55, evidence of threats of revenge uttered by the defendant from one to two years before the fire, against the owner of the building, was admitted, the court saying: "The weight of the evidence might be diminished in proportion to the length of time which intervened, but its competency would not be affected."

In *State* v. *Hoyt*, 46 Conn. 330, upon a trial for murder, the attorney for the State offered evidence that the prisoner had, thirteen years before the homicide, declared that he would like to put a ball through the head of the man murdered, with evi-

dence of declarations of a like character, made one, three and four years before the homicide. Held that the remoteness of time of the declaration went solely to its weight as evidence, and not to its admissibility.

In *Tarver* v. *State*, 43 Ala., at page 355: "It was competent, for the State to prove the fact of the previous difficulty, although not necessary, for the purposes stated in this case; that is, to prove malice on the part of the accused, as an old grudge and threats were admitted by him. But the State should not have been permitted to prove the circumstances of the former difficulty."

In *People* v. *Jones*, 99 N. Y. 667, decided June, 1885, it appears that in August, 1883, a witness was in a near room to that occupied by the defendant and his wife; that "she heard the prisoner say 'damn you,' and then heard the report of a pistol, and that his wife came rushing into her room badly frightened and agitated. In the spring of 1884, while in a room near to that occupied by the defendant and his wife, the same witness heard again the report of a pistol in that room, and upon entering the room found the wife in bed in a fainting condition."

The court held: "There was evidence sufficient to enable the jury to find that the shots were fired by the defendant, either at his wife, or in anger to frighten her. In cases of homicide it has always been held competent to show the conduct and feeling of the prisoner toward his victim, and proof that he had made previous threats or attempts to kill his victim has always been received. Evidence of such facts is received not because the facts give rise to a presumption of law as to guilt, but because from them, in connection, with other circumstances, and proof of the *corpus delicti*, guilt may be inferred. This evidence did not of itself establish the fact that the defendant intended to kill his wife at the time he fired the fatal shot; but it was to be weighed by the jury in connection with all the facts surrounding the

homicide for the purpose of determining the motive and intent
of the defendant at the time."

In *Commonwealth* v. *Holmes*, 157 Mass. 233: At the trial of
an indictment for the murder of the defendant's wife, whose
body was found buried in the cellar of the house occupied by
them, evidence in detail of threats and acts of violence by the
defendant towards his wife, extending over a period of nearly
nine years, from shortly after their marriage to about the time
of the homicide, with the exception of fifteen months, when
they were living separately, was held admissible for the purpose
of showing a course of conduct on the part of the defendant; and
the question of the remoteness of the threats and acts was said to
be addressed to the discretion of the court.

In *State* v. *Rash*, 12 Iredell's Rep., 382: "Evidence of long
course of ill-treatment of his wife, for the purpose of proving
malice, is admissible against a husband on trial for her murder,"
the court saying: "We are of opinion, then, that his honor did
not err in receiving the testimony objected to, because malice
may be proved as well by previous acts as by previous threats,
and often much more satisfactorily."

In 3 Russel on Crimes (9th ed.) 288, it is said: "On the trial
of an indictment for murder, former grudges and antecedent
menaces are admitted to be given in evidence as proof of the
prisoner's malice against the deceased." And, in a note to that
sentence, it is said: "In many cases evidence of previous vio-
lence has been given in cases of murder without objection, and
such evidence clearly tends to prove ill will."

In 2 Bishop on Criminal Procedure, section 630: "On a
charge against the husband for murdering his wife, it may be
shown that they quarrelled, or that he ill-treated her.  .  .  .
A prior difficulty, yet not irrelevant particulars, between any
defendant and the deceased, may be shown."

This whole subject was most exhaustively investigated in the
recent case of *Molineux* v. *People*, 61 N. E. 286 (Nov. 15,

1901), on an indictment for murder, where it is said: "On a criminal trial, the State cannot prove any crime against the defendant which was not alleged in the indictment, as a foundation for a separate punishment, and as aiding the proof that he was guilty of the crime charged, unless such other crime tends to prove motive, intent, the absence of mistake or accident, the identity of the person charged with the commission of the crime, or a common scheme embracing the commission of two or more crimes so closely related that proof of one tends to establish the other." *Taylor* v. *Commonwealth*, 90 Va. 109; *Kibler* v. *Commonwealth*, 94 Va. 804.

The evidence objected to was not admitted as tending to prove the perpetration of the crime with which the prisoner was charged, but for the purpose of showing the relations between the parties, their state of feeling and course of conduct towards each other, and as reflecting light upon the motive and intent with which the act was done. Nor is the admissibility of such testimony to be determined by the length of time which intervened between the threat or act proved, evidence of which is introduced, and the homicide under investigation, but the effect to be attributed to it by the jury will be in proportion to its closeness in point of time, and the directness of its association with the principal fact under consideration.

The authorities cited fully sustain the trial court, and this assignment of error must be overruled.

The next objection is to the admission of the dying declaration.

B. R. Gary, a witness for the Commonwealth, testified that he was a physician and the coroner of Newport News; that on the 3d of June, 1899, he went to the home of Alma Hamilton to see her, in order to get a statement from her in case she died. He told her that she was bound to die, and she said she knew it. Witness found Judge Brown, of the Police Court, at her bedside, who took her statement and wrote it down. The witness

was then asked by the attorney for the Commonwealth: "What
did Judge Brown say to her?" Which question was objected to
by the prisoner as being hearsay, and not in the presence of the
accused, but this objection was overruled by the court, and
prisoner excepted. The witness, proceeding to answer said in-
terrogatory, said: "Judge Brown asked her if she realized her
condition, and she (Alma) said she did. He then told her that
she should not go into eternity with a lie on her lips. She said
she appreciated it."

The Commonwealth's Attorney then asked of the witness:
"What was her statement to Judge Brown?" This question was
objected to by the prisoner on the ground that sufficient founda-
tion had not been laid for the introduction of a dying declaration.
Whereupon the Commonwealth's Attorney offered to lay suffi-
cient foundation for the introduction of the same, and withdrew
the witness from the stand, and called J. D. G. Brown, who was
sworn, and testified as follows: "I am Judge of the Police
Court of the city of Newport News. On June 3, 1899, I was
called and heard that a woman was dying over in the Rocketts
from injuries received, and I went over there at the request of
the Commonwealth's Attorney to get her dying declaration. I
went to No. 456 Twenty-fourth street, and found Alma Hamil-
ton in bed. Coroner Gary was there, and one or two colored
women. I asked her if she realized her condition, and she said
she did. I told her she ought not to go into eternity with a lie
on her lips, and she said she appreciated it. She did not make
any exclamations indicating pain or the like, except that she
said, 'O God' once; did not appear to use it in supplication or
prayer, but just as a boy would say, 'Oh Lordy,' who had
stumped his toe; that was all she said except her dying declara-
tion."

Thereupon the Commonwealth's Attorney asked the witness
to state all she said in her dying declaration. The prisoner ob-
jected to the witness giving parol evidence as to the contents of

the dying declaration, on the ground that no sufficient founda-
tion had been laid for the introduction of a dying declaration;
that it was in evidence that the declaration, if admissible, was in
writing, and therefore parol evidence of the contents was not
admissible, unless the absence of the written declaration was ac-
counted for; and thereupon the Commonwealth's Attorney in-
troduced a written instrument purporting to be the dying
declaration of Alma Hamilton, which the witness stated was the
declaration written by him and signed by Alma Hamilton, and
that it was, so far as he knew, the only statement made by her
as a dying declaration.

The admission of the written dying declaration as produced
was objected to by the prisoner through his counsel as not a
good dying declaration, and that no sufficient foundation had
been laid by the Commonwealth for the introduction of the
same; but, before the court could pass upon the sufficiency of
the same, it was withdrawn by the attorney for the Common-
wealth, who refused to again put the same before the court;
whereupon the prisoner insisted that the court pass upon the
sufficiency, which the court refused to do, and to which judg-
ment of the court the prisoner excepted.

The witness was then asked to tell what Alma Hamilton
said in her dying declaration, which question the prisoner ob-
jected to, as the written declaration was in existence, and the
best and the only admissible evidence until the court should pass
upon its sufficiency, and determine if it was admissible in evi-
dence as a dying declaration, which objection the court over-
ruled, and the prisoner excepted to the opinion of the court in
overruling it.

Witness in answer said: "The declaration was that Alma
Hamilton said that William O'Boyle came to the house, and
that she was at Lucy Hubbard's; he smacked her once, and that
they had an altercation, and that she tore his shirt off, and that
he knocked her down and stamped her twice; and she then

crawled into her room, and that he came back and kicked her in the back."

The prisoner again objected to the answer, which objection the court overruled, and the prisoner excepted.

The Commonwealth had made out a sufficient case for the introduction of a dying declaration. Such declarations are admissible when made under a sense of impending death without any hope or expectation of recovery. "When this is made to appear by proof, or by the circumstances of the case, dying declarations to identify the prisoner, or to establish the circumstances of the *res gestæ*, or to show transactions from which death results, are always admissible, to have the same weight as if made under the sanction of an oath. For it is considered that when an individual is in expectation of impending death, all temptation to falsehood, either of interest, hope or fear, will be removed, and the awful nature of his situation will be presumed to impress him as strongly with the necessity of a strict adherence to truth as the most solemn obligation of an oath administered in a court of justice." *Swisher* v. *Commonwealth*, 26 Gratt. 964.

It fully appears here that the declarant was well apprised of the mortal nature of the injury she had received, and was conscious of impending death. The Commonwealth, having laid the foundation, offered in evidence the written declaration; but, upon the prisoner's objection, that declaration was withdrawn. He cannot be heard to complain because the Commonwealth, at his request, did what he asked the court to compel it to do. The written declaration having been withdrawn, it was plainly proper to introduce evidence of a verbal declaration.

Isaac Berman, a witness introduced for the defence, testified as follows: "I kept a grocery store at No. 456 Twenty-fourth street, in the city of Newport News, on June 2, 1899. I knew Alma Hamilton. I knew Billie O'Boyle. He used to come there and get orders for meals and things. He worked in a res-

taurant at Twenty-third street and Warwick avenue. Alma used to deal with me. She came into the store at 11 o'clock A. M. on June 2. I asked her when she was going to take laudanum again. She said she had had enough, and showed me her neck and chest where it was bruised, and said that was what it had done for her last time she took it. She bought snuff while she was there. I saw her rushing the 'growler' for beer all day—she had it in a white pitcher with flowers on it."

"What else did she say at 11 A. M. on June the 2d?"

"She told me about an accident she had that morning."

When the witness had reached this point, without objection, counsel for prisoner asked him what was the nature of the accident which happened to her on the morning of the 2d of June? To this question the Commonwealth, by its attorney, objected, and the objection was sustained by the court.

The attorney for the prisoner sought to elicit what he desired to know by propounding substantially the same questions, with various modifications, which were objected to and excluded; and thereupon the court's attention was called by the attorney for the defence to the testimony of Dr. Hume in this case, who said:

"I was present at the autopsy over the body of Alma Hamilton, and found an injured peritoneum, evidently caused by striking an object, or being struck by an object; that it could have been caused by stamping with the foot; that this injury caused peritonitis, and that peritonitis caused Alma Hamilton's death; that the wound he found in the abdomen could have been caused as readily by propelling the body against an object as by propelling an object against the body, and that falling against a desk, chair or bed could have caused this injury."

The accused then offered to prove by the witness, Isaac Berman, "that Alma Hamilton stated on the morning of June 2, 1899, that about 9 or 10:30 A. M. of the same day, and some hours prior to the difficulty between her and William O'Boyle, she was trying to lay the baby on the bed; that she fell and the

bed post struck her in the stomach; that she was, at the time of
this conversation, suffering and complaining terribly of pains in
the stomach from this injury, and offers to prove by medical
experts that a person receiving such an injury in Alma Hamil-
ton's condition would be liable to peritonitis, and that the nat-
ural and probable result of such an injury would be peritonitis
and death."

To this evidence the Commonwealth again objected, and it
was excluded.

In Stephen's Digest of the Law of Evidence (2d ed.), page 47,
it is said: "It is a general rule that expressions of present bodily
pain or suffering or symptoms of illness are admissible as part of
the *res gestæ*, and whether made to physicians or to other per-
sons, may be proved by those who heard them. But statements
as to past sufferings, or as to the past cause of the injury or of
the suffering, are not admissible. . . . Some cases even as-
sert (mainly, however, as *dicta*) that statements made to a phy-
sician for medical treatment may be proved, though they relate
to past (as well as present) feelings and symptoms."

In Greenleaf's Evidence (15th ed.), section 102, it is said:
"Wherever the bodily or mental feelings of an individual are
material to be proved, the usual expressions of such feelings,
made at the time in question, are also original evidence. If
they were the natural language of the affection, whether of
body or mind, they furnish satisfactory evidence, and often the
only proof of its existence. And whether they were real or
feigned is for the jury to determine."

And, in a note upon that section, it is said: "The rule admits,
however, only exclamations of present pain, or statements of
present symptoms. All statements made by the sick person re-
lating to past transactions, however closely they may be con-
nected with the present sickness, and even (it is held in most
States) though stating the cause of the sickness or injury, should
be rejected even if made to a physician for treatment, unless the

statements are otherwise admissible, as part of the *res gestæ*."
See also Wharton's Crim. Ev. (9th ed.), sec. 264.

In *Smith* v. *State*, 53 Ala. 487, it is said: "Declarations
made by the deceased, about 10 o'clock on the morning of the
day before her death, while suffering with paroxysms of pain
and vomiting—in answer to question asked in the hearing of
the husband—to the effect that she was taken sick while at
breakfast that morning, at which she had eaten bread, are not
admissible as parts of the *res gestæ* on the trial of the husband
for poisoning her. Such evidence might be received as the basis
of a medical opinion, but as evidence of independent facts it is
entirely inadmissible."

In *Williams* v. *Great Northern Ry. Co.* (Supreme Court of
Minnesota), 37 L. R. A., p. 199, it is held: "Whenever bodily
suffering is material to be proved, expressions or complaints,
made at the time, which are the natural and instinctive mani-
festations of pain and suffering, are competent evidence as part
of the *res gestæ*, and may be testified to and described by any
person in whose presence they were uttered. Distinction is
noted between such complaints and the mere narration of past
symptoms or simple descriptive statements, which furnish no
evidence of the existence of suffering except the assertion of the
party."

In *Commonwealth* v. *Jardine*, 143 Mass. 567, the defendant
offered testimony to show that he was severely beaten by the per-
son alleged to have been assaulted, and attempted to show that
during his confinement he made complaints of pain and suffer-
ing in limbs and body. The court held "it was competent for
the purpose for which it was offered, and should have been ad-
mitted. The complaint of pain and suffering would not include
statements of facts, nor narrations of past occurrences."

*Insurance Co.* v. *Mosley*, 8 Wall. 397, was an action on a
policy of insurance, and the proof was that the assured left his
bed Wednesday night, the 18th of July, 1866, between 12 and

1 o'clock; that when he came back, he said he had fallen down the back stairs and almost killed himself; that he had hit the back part of his head in falling down stairs. Witness stated that his voice trembled; that he complained of his head, and appeared to be faint and in great pain.

Objection was taken to that part of this evidence which related to his falling down stairs and the injuries he received by the fall; and the court, Mr. Justice Swayne delivering the opinion in which it was held that the evidence should have been admitted, said:

"There is a limitation of this doctrine that must be carefully observed in its application.

"Such evidence must not be extended beyond the necessity upon which the rule is founded. It must relate to the present, and not to the past. Anything in the nature of narration must be excluded. It must be confined strictly to such complaints, expressions, and exclamations, as furnish evidence of 'a present, existing pain or malady.' Examined by the standard of these rules, the testimony to which this exception relates was properly admitted."

The observations of the court in that case thus far quoted are in entire accord with the cases and text-writers which we have already cited. But, continuing, the court said: "Was it competent to prove the fall by the declarations of the assured made under the circumstances disclosed in the bill of exceptions?" And it was held that the evidence was admissible for that purpose as being so near in point of time to the fact as to constitute a part of the *res gestæ.*

Of this case Grover, J., in *People* v. *Davis,* 56 N. Y. 102, said: "The doctrine as to what may be regarded as part of the *res gestæ* was certainly carried to its utmost limit by a majority of the court;" but with this feature of the opinion we are not now concerned.

The declaration sought to be introduced in the case before us

was certainly not a part of the *res gestæ*, and nowhere is the distinction between the value of exclamations as evidence of a present existing pain or malady and such expressions when in the nature of a narration of a past transaction, more clearly presented than in *Insurance Company* v. *Mosley*.

In *Fleming* v. *Springfield*, 154 Mass. 520, the court, dealing with this question, said: "The testimony of Dr. Rice was properly admitted. The statement made by the plaintiff purported to be a description of his symptoms at the time it was made, and not a narrative of something that was past."

*Northern Pac. R. R. Co.* v. *Urlin*, 158 U. S. 271, is in harmony with the authorities we have considered. See also *Livingston's Case, supra*, to the same effect.

The statements of Alma which were rejected were not admissible as a part of the principal transaction under investigation. They did not bear directly or indirectly upon the assault made upon her by plaintiff in error; nor, if the accident alleged to have happened to Alma be considered the *res* or subject under consideration, were they so related to that incident in point of time or circumstance as to constitute a part of it. It was an effort to introduce a narrative of a past occurrence, resting upon the mere statement of the deceased, and was plainly hearsay evidence, and not within any exception to the rule which forbids its introduction.

We are of opinion there is no error in the judgment complained of, and it must be affirmed.

*Affirmed.*