## 𝔖𝔱𝔞𝔲𝔫𝔱𝔬𝔫.

### WYATT PENDLETON V. COMMONWEALTH.

September 22, 1921.

Absent, Burks, J.

1. HOMICIDE—*Sufficiency of Evidence to Support Verdict—Motive of Homicide—Appeal and Error—Judgment Plainly Wrong or Without Evidence to Support it.*—It was argued that a judgment of guilty in a prosecution for homicide should be set aside as plainly wrong or without evidence to support it. It was contended that accused was justified in shooting the deceased in order to put an end to his alleged lewd purpose toward a female relative of accused.

   *Held:* That judgment could not be reversed on this ground, as it affirmatively appeared from the evidence and the testimony of accused that this was not the motive for the killing, and that the killing was not necessary to accomplish that end, as accused himself testified that he did not need anything but his hands to handle deceased.

2. HOMICIDE—*Appeal and Error—Judgment Plainly Wrong or Without Evidence to Support it.*—Where the plea of self-defense was the sole defense relied on by the accused to justify the shooting on the trial of a prosecution for homicide, a consideration of the sufficiency of the evidence to support the verdict and judgment must be confined to a consideration of the evidence as bearing upon that defense.

3. HOMICIDE—*Self-Defense—Appeal and Error—Sufficiency of Evidence to Support Judgment.*—In the instant case, a prosecution for homicide, the accused interposed the defense of self-defense.

   *Held:* That an examination of the evidence showed that the testimony was sufficient to warrant the jury in concluding that deceased was shot when his back was towards accused, and from the character of the wounds, the jury might have reasonably regarded the fact to have been that the hand of deceased was in the natural position of one fleeing from another, and not as accused testified in the position of drawing a pistol.

4. DYING DECLARATIONS—*Scope of Declaration—Res Gestae—Admissibility.*—A dying declaration must concern the facts leading up to or causing or attending the injurious act which resulted in the declarant's death. Such topics are the *res gestae* within the meaning of that phrase as used in the books in connection with the doctrine of dying declarations, and such declarations are always admissible and have the same weight as if made under the sanction of an oath.

5. DYING DECLARATIONS—*Admissibility—General Rule.*—Within the limitation that the declaration must be confined to "the facts leading up to, or causing or attending the homicide," any dying declaration which would be admissible as testimony had the dying person been sworn as a witness is admissible in evidence as a dying declaration. Within such limitation, the test of the admissibility or nonadmissibility of the dying declaration is whether it is hearsay, or matter of opinion, or altogether irrelevant; in such cases it is inadmissible; or whether, within the said limitation, it relates to facts within the knowledge of the declarant which are relevant. In such case it is admissible.

6. DYING DECLARATIONS—*Admissibility—Accused Borrowing Money from Defendant—Accused Testifying on Same Subject.*—A dying declaration that accused a few hours before the homicide borrowed money from the declarant was admissible as showing the conduct of deceased and accused towards each other a few hours before and leading up to the shooting, and was material in its bearing upon the animus of the accused at the time of the shooting. Especially there was no error in its admission in view of the fact that accused himself testified on the subject, and the Commonwealth, without objection, introduced rebuttal testimony, and subsequently accused introduced further testimony.

7. DYING DECLARATIONS—*Conclusion of Declarant—Declaration that Deceased Did Nothing—Case at Bar.*—In the instant case the dying declaration in question were in substance that accused shot the deceased; that deceased was doing nothing at the time and had done nothing previously to accused or to anybody to give the accused any cause to do the shooting.

   *Held:* Admissible.

8. DYING DECLARATIONS—*State of Feeling between Declarant and Accused.*—The statements in a dying declaration, consisting merely of the state of feeling of the declarant towards the person who committed the homicide, is inadmissible in evidence. But this is not because the state of feeling between such parties leading up to and at the time of the homicide is immaterial or irrelevant, for it is decidedly material and relevant. The reason for this rule is that the accused must be tried for his deeds

in the light of the situation as it reasonably appeared to him from the outward conduct and demeanor of the deceased, and not in the light of the secret state of feeling existing on the part of the deceased.

9. DYING DECLARATIONS—*Admissibility—Conclusion of Fact.*—A dying declaration is not inadmissible in evidence merely because it states a conclusion of fact, but to be admissible it must refer to a fact or facts which are relevant and which, if they do not attend the very time of the homicide, or concern the cause of the death, are so nearly antecedent in time as that it may be reasonably considered that they tend to show the motive and probable conduct of the accused at the time of the homicide, which are in issue in the case.

10. DYING DECLARATIONS—*Admissibility—Conclusion of Fact—Declaration that Accused Killed Deceased Without Cause.*—Thus declarations to the effect that accused killed deceased "without any provocation on his part," or "without a cause," or "for nothing" have been held admissible as statements of fact and not of opinion or inference.

11. DYING DECLARATIONS—*Self-Serving.*—Dying declarations are not inadmissible because self-serving, since for the most part dying declarations of deceased persons put in evidence by the Commonwealth, and universally held to be admissible, in accordance with the well established doctrine on that subject, are exculpatory of the deceased and inculpatory of the accused, and so must be said to have a self-serving purpose.

12. DYING DECLARATIONS—*Admissibility—Statements of Deceased's Conduct in Regard to His Relations with Accused and a Female Relative of Accused Prior to the Killing.*—Where the relations of the deceased with the accused and a female relative of accused, which were in question, consisting of their conduct toward each other, had existed only for a few weeks prior to the homicide, the conduct of the deceased towards the accused and the female relative during the whole of that time may be fairly said to have been relevant and hence admissible in evidence as a part of the circumstances leading up to the homicide, and the dying declarations of the deceased on the same subject are properly admissible, especially where the Commonwealth, without objection, and the accused, introduced a number of witnesses concerning such relations during the whole of this time.

13. HOMICIDE—*Adverse Witness—Court Witness—Cross-Examination.*—On a prosecution for homicide the Commonwealth moved the court to introduce as a court witness a witness who was not sent before the grand jury and had refused to talk to any one about the case, saying that she did not know anything. This

the court did over the objection of accused, and after the witness had been examined by the court, "the witness showing great reluctance to testify," attorneys for the Commonwealth were permitted to cross-examine her as a hostile witness.

*Held:* That under section 6214 of the Code of 1919, such action by the court was not error.

14. WITNESSES—*Cross-Examination—Hostile Witness.*—In the instant case the Commonwealth introduced a witness as a Commonwealth's witness and after her examination in chief the trial court permitted the attorneys for the Commonwealth to cross-examine her. The trial court certified as a fact that the "witness had shown on her examination in chief by her demeanor and her answers that she was a hostile witness."

*Held:* No error under section 6214, Code of 1919.

Error to a judgment of the Circuit Court of Buckingham county.

*Affirmed.*

The accused was indicted for the murder of the deceased, Frank Raymond Barker. The indictment is in the form of an indictment for murder at common law. There was a trial by jury. The verdict of the jury found the accused guilty of murder in the second degree, as charged in the indictment, and fixed his punishment at ten years' confinement in the penitentiary. The trial court entered judgment and sentenced the accused accordingly.

The deceased was mortally wounded on the night of Sunday, August 29, 1920, a bright moonlight night, by being shot in the back with buckshot from the discharge of a shotgun in the hands of the accused. The accused admits that he shot the deceased and that he did so intentionally; but claims that he did it in self-defense, thinking that he was in danger at the time of being killed by the deceased, who, as the accused testifies, "turned towards me and threw his hand to his hip pocket" just before the fatal shot was fired.

The circumstances and the material conflicts in the testi-

mony as to the circumstances, or facts, leading up to the shooting were as follows: Daisy Moss, a girl of between fifteen and sixteen years of age, a sister of the wife of the accused, had been in the home of the accused for about five weeks prior to the shooting—the family consisting during that time of the accused, his wife, who .was in delicate health, Daisy Moss and the father of the accused. About four weeks before the shooting the deceased began to take his meals at the home of the accused as a boarder and did so for about three weeks and up to about one week before the shooting. The accused testified that, while the deceased was taking his meals at the home of the accused, the attentions of the deceased to Daisy Moss became very marked and persistent. That several times while the deceased and the girl were sitting on the porch after supper the accused heard the girl say to the deceased that if he did not stop and behave himself she would go in the house. That on the Saturday night, which was a week and a day before the shooting, the accused looked through the window and saw the deceased and Daisy "sitting on the porch floor, with their feet on the ground; she was sitting close to one of the porch posts and Raymond was sitting wedged up against her with his leg over both of her legs and his arm across her back." That he (the accused) started to go out there, but his wife dissuaded him and went herself and told Daisy to come in. The accused further testified that, "The next morning I talked it over with my father and we decided for my father * * * to tell Barker that he must stop taking his meals there and must get some other place to take his meals as quick as he could and that he must let Daisy alone and not visit her or go with her any more. And my father told Barker that on that day, which was Sunday morning. On the next morning, Monday, I told Barker the same thing; that he must get another place to take his meals at once, and that he must let Daisy alone

and have nothing more to do with her." The father testified that he did, on the Monday just mentioned, tell the deceased that he couldn't take his meals there any longer, but stated, in substance, that he did not tell the accused to let Daisy alone and not visit her or go with her any more and did not know of his own knowledge that anyone told the deceased not to go with the girl.

Daisy Moss testified, in substance, that there was nothing improper in the conduct of the deceased towards her. That she "thought he was a nice boy." That he stopped taking his meals at the home of the accused "because I was cooking and it was too much for me."

The testimony of the accused and of other witnesses in his behalf before the jury was to the effect that the deceased was lewd in his conduct with women, having a bad general reputation in that respect, and that the accused was informed of this after the deceased began to board in his home. Whereas, there was testimony for the Commonwealth to the effect that the general reputation of the deceased in the particular just mentioned was good.

The accused further testified that he left home on the Monday last above mentioned and was absent for three or four days. That on his return his wife told him that in his absence the deceased had been to the home of the accused to see Daisy. That the deceased also met Daisy at the home of Ben Pendleton, a brother of the accused, on Saturday evening, the day before the shooting, as the accused heard. That on Sunday morning, the day of the shooting, the accused was told that, on the day before, the deceased, while somewhat under the influence of liquor, had made statements to a companion, named Charlie Jones, which were to the effect that he intended to seduce and have carnal intercourse with Daisy Moss, the first chance he might have. This companion of the deceased repeated these statements to the accused on the Sunday morning just mentioned, be-·

fore the accused and the deceased went on the trip together now to be mentioned.

Without objection on the part of the accused, the Commonwealth introduced testimony to the effect that on the Sunday of the shooting the accused and the deceased, along with a number of others (the party consisting of about ten or twelve in all), hired seats in a truck and went on a trip from Dillwyn to see the bridge across James river at Bremo, which had been damaged by high water, and this testimony tended to show that the accused and the deceased were apparently on friendly terms while on this trip. There is a reference in the dying declaration, more specifically mentioned below, which was introduced in evidence in chief for the Commonwealth, to the effect that the deceased said on his deathbed that the accused had borrowed of the deceased all the money the deceased had on the day of the shooting, which the testimony of and for the accused later introduced developed had reference to the conduct of the accused towards the deceased on the trip just mentioned; but it was the testimony of the accused himself which made a specific issue of fact before the jury concerning whether the accused borrowed any money of the deceased on such trip, the accused testifying that he borrowed money from one Wirt Hill instead of from the deceased, and that the deceased borrowed money from one Tom Maxey. Whereupon, the Commonwealth in rebuttal, without objection from the accused, introduced a witness who testified that the deceased "loaned" the accused "a dollar on that trip, when they were returning." Thereafter Wirt Hill and Tom Maxey were called as witnesses for the defense, the former testifying that he "loaned" the accused one dollar on that trip and both testifying that they did not see the accused borrow any money from the deceased on the trip and "would have seen it if he had borrowed any money from him."

There was testimony for the accused tending to show that the deceased habitually carried a pistol and was a rowdy, quarrelsome and dangerous person and that he bore that general reputation during the last years of his life; but that he was never heard to make any threat against the accused.

Coming now to the occurrences which followed the return of the accused and the deceased from the trip to Bremo, the following is the testimony of the accused as to what transpired up to and including the shooting and his motive therefor:

"We got back about seven or eight o'clock, and as I wanted something to smoke I went to Ellis' store, and Barker also went to the store to get something to smoke. I had nothing to say to him; he went without any invitation from me to get something for himself to smoke. On the way back from the store to E. D. Gregory's office, I collared Raymond Barker and told him what Charlie Jones had told me and he did not deny it, but hung his head. I told him, "you have those rubbers in your pocket for her now and you have your pistol in your pocket and you are carrying for me." And I told him he must let Daisy alone and have nothing more to do with her while she was at my house, and he promised me that he would not go with her again. Then I stood on the corner of the street for a while with Charlie Jones, Ben Pendleton, Barker, and others, and Daisy Moss, Frances Ranson and Eliza Huddleston came by on their way to church. Barker spoke to them when they passed. We stayed there a while and Barker slipped off from us without saying anything to anybody, and when I missed him, I believed he had gone to the church after Daisy Moss.

"I was unarmed and that he always carried a pistol and I had seen him have it in his pocket that day, and I had determined not to let him go with Daisy Moss while she

was in my care. I then went home and got a single barrel gun that I had borrowed some months before to keep the crows off the corn. I had bought four shells when I got the gun, and two of them were buck shot and two small shot; I got them that way because I just got the odd shells that Mr. Pearson had at his store so as not to break a box. I had shot three of the shells and had only one left and that was a buckshot shell. I got this shell and the gun and started out, and my wife asked me what I was going to do with the gun, and I told her that I was not going to hurt anybody and that I would be back soon. I said I was going to keep Barker from going with Daisy tonight. I went back to my brother, Ben Pendleton's house, I passed the front of the house and Barker was sitting on the front porch. I went around to the side and looked into the window and then went in the kitchen where my brother was eating his supper. Barker saw me as I passed the front porch with the gun, it was only about fifteen feet from the porch where he was sitting and the moon was shining. When I went into the kitchen Ben asked me what I was going to do with the gun, and I told him I was going to keep Barker from going home with Daisy that night, that I thought he was trying to seduce her, and Ben told me that Barker had walked by with Daisy from the church, holding her by the arm. I told Ben to go with Daisy home, and Ben said to leave it to him and he would fix it. I had seen Daisy in the room with Frances when I looked in the window (the house is a cottage). Ben had told me to go on home and go to bed and he would fix it all right. I went out back of the house to see what they were going to do, the weeds were tall, but I could see over them, from where I was I could see the main road over which I had come from my house to Ben's and I could see if they came out the back way. I could see them no matter which way they went to my house, I wanted to see if Barker was going to go home

with Daisy that night and I was going to try to stop him if he did.

"I laid the gun down in the weeds. After I had been there about ten minutes Daisy Moss, Mrs. Ben Pendleton and Frences Ranson came out of the back door and Barker followed them out and took hold of Daisy's arm and started to walking with her, and she wanted to go home by the main road, the way I came there, but Barker said, 'No, we will go this way,' and pulled her up through the weeds toward me, and I heard Barker say, 'God damn,' and something else, but did not understand what else he said. They all passed by me and after they had passed me a few steps, Frances Ranson looked back and saw me. She said, 'Lord, yonder's Wyatt.' Then Mrs. Pendleton ran back past me, Frances ran the other way and Barker pushed Daisy over in the weeds and told her to 'Run for your life, I will take care of Wyatt,' and he then turned toward me and threw his hand to his hip pocket; I grabbed the gun off the ground and fired from my hip at Raymond Barker as I raised the gun, I did not get it to my shoulder; just as I fired Daisy stumbled in the weeds, and Barker turned back toward her as I fired, with his right hand still on his hip pocket.

*"Cross-Examination.*

"By Attorneys for the Commonwealth:

"I shot Barker because I thought that if I did not shoot him he would shoot me, if I had not shot him he would have shot me. I shot him in self-defense. I was going to him without anything in my hands. I did not need anything but my hands to handle Barker with, if he did not use his gun, but when I saw him put his hand to his hip pocket, and about to draw his pistol, I knew that he would shoot

me if I did not shoot him first, and that was why I shot him."

\*　\*　\*　\*　\*　\*　\*　\*　\*　\*

"I wanted the gun to protect myself with and that was why I went after it that night. \* \* \* I did not intend to use the gun unless Barker tried to use his pistol. I did not try to get behind any building there, the nearest building was about fifty feet and I could not get behind it, so that there was nothing I could get behind to keep Barker from shooting me. When I raised my gun and just as I shot, Barker turned to look at the girl (Daisy Moss)." \* \* \*

There was testimony before the jury in conflict with that of the accused on the following material points:

(a) Daisy Moss testified that the exclamation of Frances Ranson when she looked back and saw the accused was not merely, "Lord, yonder's Wyatt," as stated by the accused; but "Lord, there is Wyatt back of us with a gun;" whereas, the accused testified that his gun was then lying on the ground in the weeds.

(b) The testimony of Frances Ranson bears upon its face, as it appears in the record, evidence that it was reluctantly given where inculpatory of the accused and readily given where favorable to him. On the question of whether she saw the gun in the hands of the accused when she first discovered him and made the exclamation aforesaid, she first says that she did then see the gun in his hands. She then states that she did not see the gun when she first saw the accused, but only after she ran and was looking back. Later in her testimony she testified to the effect that when she first saw the accused she saw him standing with the gun in his hands. Her testimony is also both ways on the question of whether the accused fired the shot "right away" following her first seeing him with the gun in his hands, or whether there was an interval after her first seeing him in which she was running, and, looking

back as she ran, saw the deceased push Daisy Moss from him, turn towards the accused and make the hip-pocket movement, before the shot was fired.

(c)   There is no conflict in the evidence that the shot from the gun struck both sides of the back of the deceased, and, so far as the course of the shot is disclosed by the evidence, the evidence tended to show that the shot penetrated, not obliquely, but practically in a direct line from the back towards the front of the body, tending to establish as a physical fact that the accused shot the deceased when his back was practically directly towards the accused. Other buckshot struck the right hand of the deceased, one of them entering the palm of that hand, demonstrating that the palm of that hand was turned in the direction of the accused at the time of the shot, and the ends of the forefinger and thumb of that hand were struck by either one or two separate shot.

(d)   The testimony of the accused that "just as I fired Daisy stumbled in the weeds and Barker turned back towards her as I fired," is unsupported by any other testimony. No other eyewitness of the occurrence testified to any stumbling of the girl, or any turning away of the deceased from the accused. On the contrary the direct testimony of the eyewitnesses of the shooting, other than the accused, in so far as it was favorable to the accused, was to the effect that when Frances Ranson discovered the accused and made the exclamation aforesaid, the deceased turned and faced the accused, making the hip-pocket movement as he turned, and that the shot followed while the deceased was in that attitude. But this was manifestly physically an impossibility, in view of the fact that the wounds were in the back of the deceased.

(e)   There was testimony for the Commonwealth in rebuttal which very conclusively established that the deceased had no pistol about his person when he was shot;

and the rebuttal testimony for the Commonwealth also tended to show that the deceased had no pistol that day; that he was not in the habit of carrying a pistol; and that his general reputation was that of a quiet peaceable person, as boy and man.

The dying declarations of the deceased, admitted in evi⸗ dence over the objection of the accused, were made to his mother, who testified as a witness for the Commonwealth, and contained the following statements:

"He said that he was shot for nothing, that he had never done anything to him or to anybody on earth. * * * He said Wyatt Pendleton shot him, and he says, 'He shot me for nothing.' * * * He·said he was right out there, coming out from Mr. Ranson's, and he wasn't doing noth- ing, and he shot him. * * * he said he hadn't given him any cause to do it. He said he borrowed all the money he had that day. He said he loaned him all—two pennies in his pocket and he loaned him that."

Other specific testimony and pertinent matters are re- ferred to in the opinion of the court.

*F. C. Moon* and *J. B. Boatwright,* for the plaintiff in error.

*John R. Saunders, Attorney-General; J. D. Hank, Jr., Assistant Attorney-General,* and *Leon M. Bazile, Second Assistant Attorney-General,* for the Commonwealth.

SIMS, J., after making the foregoing statement, deliv- ered the following opinion of the court:

The following questions raised by the assignments of error will be disposed of in their order as stated below:

1. Does it appear from the evidence that the judgment under review is plainly wrong or without evidence to sup- port it?

This question must be answered in the negative.

[1] It has been earnestly and ably argued before us in behalf of the accused that he was justified in shooting the deceased in order to put an end to his alleged lewd purpose toward and persistent attentions to Daisy Moss. But it affirmatively appears from the evidence that this was not the motive for the shooting and that the shooting was not necessary to accomplish that end, even from the viewpoint of the accused. For, as appears from his testimony, quoted above, the accused stated before the jury, "I was going to him without anything in my hands, I did not need anything but my hands to handle Barker with, if he did not use his gun."

[2, 3] The plea of self-defense was the sole defense relied on by the accused on the trial to justify the shooting, and hence our consideration of the sufficiency of the evidence to support the verdict and judgment must be confined to a consideration of the evidence as bearing upon that defense.

In so far as the question of the sufficiency of the evidence is concerned, the case turns upon the issues of fact of whether the gun of the accused was lying on the ground in the weeds as he arose, when Frances Ranson first saw him and made the exclamation shown in evidence; of whether the deceased turned towards the accused and threw his right hand to his right hip pocket; of whether the accused then for the first time "grabbed the gun off of the ground" and fired at the accused, and of whether, just as the accused fired, the girl stumbled in the weeds and the deceased turned back towards her, and thus received the wounds found upon his person; or whether the accused arose with the gun in his hands, and the deceased did not throw his hand to his hip pocket, but had his back practically directl towards the accused when the gun was fired. There was sufficient evidence to support the finding of the jury either way; hence their verdict was binding upon the court below and is binding upon us.

44

The direct testimony for the Commonwealth, it is true tended in part to sustain the version given by the accused of what occurred, but the credibility of such part of the testimony was solely for the determination of the jury; and the circumstantial evidence furnished by the absence of any pistol in the pocket of the deceased, by the mute wounds upon the back of the deceased, and the spontaneous exclamation of Frances Ranson, if it consisted of the words, "Lord, there is Wyatt back of us with a gun," as the testimony for the Commonwealth tended to show was true, were sufficient to warrant the jury in disbelieving the testimony of and for the accused on the subject of the alleged hip-pocket movement, and, hence, in discarding the self-defense theory.

While possible, it was in the highest degree improbable, if the deceased turned so far facing the accused as to make a demonstration against the latter of drawing a pistol from the hip pocket, that, even if the attention of the deceased was attracted elsewhere by the girl stumbling in the weeds, he would have then turned so far away from the accused as to have received the discharge from the gun practically directly in the back. If this movement had occurred, the strong probability is that the deceased would have been shot in the right or left side, dependent upon whether he had turned to the right or the left in the attempt to draw a pistol. Indeed, it is stated in the petition of the accused for the writ of error, that just at the moment the shot was fired, "Daisy Moss, who had started to run, stumbled in the weeds and Barker, hearing her stumble, partly turned towards her with his hand still on his hip pocket, so that his right side and back were thus turned towards petitioner just as petitioner fired. The shot from petitioner's gun, therefore, penetrated Barker's right side and back * * *." But unfortunately for the accused the uncontroverted testimony of the physician who examined the wounds was as follows:

"There were four shot in his left thigh, one came through here; there was one in his right, that is below the hip joint in the pelvic bone, two here and one in the palm of his hand.   Then his right forefinger and his right thumb at the end were shot.   I counted eight shot in his body—four in his left thigh and one in his right; that is five; two here (indicating), and one in the palm of his hand."

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*

*Cross-Examination.*

"Q. By Mr. Moon.   I don't exactly catch how those shot were.   How many shot struck him?

"A. Nine shot I know of.

"Q. Will you show me where they were?

"A. (Indicating).   There were four that went into his left thigh; two came through here, and one in his right thigh and that came through just under the surface of the skin, and one struck him just below the hip bone, and there were two hit him in his buttock, just to the right of the middle line, just about there, and one struck him in the palm of his right hand, and his finger and thumb were shot."

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*

"Q. They went in sort of from the side and back, those shots did, didn't they?

"A. I think they were pretty much from the back.

"Q. How did they come out?

"A. They came out straight in front.

"Q. You pointed out where the shot entered. Now point just where they came out.

"A. They came out just to the center of the thigh.

"Q. About the center of the right side? And the left?

"A. Right and left.   I don't know which side of the leg bone they went.   The one that went in the right thigh seemed to go right straight through the thigh."

This testimony was sufficient to warrant the jury in concluding that the deceased was shot when his back was practically directly toward the accused.

Again: It is contended for the accused that the fact that one shot penetrated the palm of the right hand of the deceased confirms the testimony of the accused that the right hand of the deceased was in his hip pocket at the time the gun was fired. This may have been so. But, in view of the character of the other wounds aforesaid, the jury may have reasonably regarded the fact to have been that the hand was in the natural position of one fleeing from another, namely, at the side, when the gun was fired, in which position the shot would have penetrated the palm as it did.

[4] 2. Were the dying declarations of the deceased, admitted in evidence over the objection of the accused, of such character as to have been properly admissible in evidence as dying declarations?

It appears from the petition for the writ of error that the objections of the accused to the declarations in question which are insisted upon before us are those shown by the record to have been made and overruled in the trial court, and they are, in substance, as follows:

That the declarations do not come within the meaning of dying declarations. "His (the deceased's) treatment of other people and how he treated the accused and their previous relations cannot be the subject of a dying declaration. * * * A dying declaration ought to be one as to circumstances; as to what actually happened. I move to exclude the whole thing, but particularly that part which refers to their previous relations."

As stated in 2 Wigmore on Ev., sec. 1434: "* * * the declaration may not concern any and all topics. It must concern the facts leading up to or causing or attending the injurious act which resulted in the declarant's death: * * *""

Such topics, on principle and according to the weight of authority, are the *res gestae,* within the meaning of that phrase as used in the books in connection with the doctrine of dying declarations.

As said in *O'Boyle's Case,* 100 Va. 785, at p. 795, 40 S. E. 121, at p. 124: "* * * dying declarations to identify the prisoner, or to establish the circumstances of the *res gestae,* or to show transactions from which death results, are always admissible, to have the same weight as if made under the sanction of an oath."

See to same effect *Swisher's Case,* 26 Gratt. (67 Va.) 963, 21 Am. Dec. 330, and *Richards' Case,* 107 Va. 881, 59 S. E. 1104.

[5] Within the limitation that the declaration must be confined to "the facts leading up to, or causing or attending the homicide," any dying declaration which would be admissible as testimony, had the dying person been sworn as a witness, is admissible in evidence as a dying declaration. Within such limitation, the test of the admissibility or nonadmissibility of the dying declaration is whether it is hearsay, or matter of opinion, or altogether irrelevant. In such cases it is inadmissible. Or whether, within the said limitation, it relates to facts within the knowledge of the declarant which are relevant. In such case it is admissible. Clark's Crim. Proc. sec 210; 10 Am. & Eng. Ency. L. (2nd ed), p. 376-7.

In the authority last cited, at p. 376, this is said:

"Dying declarations being a substitute for sworn testimony must be such narrative statements as would be admissible had the dying person been sworn as a witness. If they relate to facts to which the declarant could have thus testified, they are admissible."

[6] What we have said above, and the quotations we have made from the authorities, is sufficient to dispose of that portion of the dying declarations in question which had

reference to the borrowing by the accused of money from the deceased. This was a fact, consisting of conduct of the accused and the deceased towards each other a few hours before and leading up to the shooting, and was material in its bearing upon the animus of the accused at the time of the shooting. Since the accused was being tried upon the charge of murder, that animus was a material issue in any aspect of the case. Had the deceased lived and been sworn as a witness in the case, there can be no doubt that his testimony on this subject would have been admissible. And especially would there have been no error in its admission in view of the fact that the accused himself testified on this subject and the Commonwealth, without objection on the part of the accused, introduced rebuttal testimony, and subsequently the accused introduced further testimony, on the same subject.

This being the situation, we have no hesitancy in holding that the portion of the dying declarations just mentioned was properly admitted in evidence.

[7] Concerning the remainder of the declarations, there is more difficulty. The declarations appear in detail in the statement preceding this opinion. While general and in the form of conclusions they all concern conduct of the accused. They are in substance, that the accused shot the deceased; that he (the deceased) was doing nothing at the time and had not previously done anything to the accused or to anybody to give the accused any cause to do the shooting. Considered in the light of the other evidence in the case we have no doubt that these general statements had the specific meaning to the jury that the declarant stated that he did nothing at the time of the shooting, to the accused or to Daisy Moss, and had done nothing previously to either of them to give the accused any cause for the shooting.

There are two objections which we find from the authorities have been sometimes urged to such declarations; one

that they are conclusions of fact and hence embody matter of opinion—which goes to all of the declarations; the other —which goes only to the declaration as to conduct previous to the very time of the homicide—that such declarations concern circumstances too remote from the homicide to be admissible as dying declarations.

As we understand the objections of the accused to the declarations, they are not that they are inadmissible because they are conclusions of fact, or opinions, but take the position that the declarations are inadmissible in evidence for the sole reason that they concern conduct of the deceased towards other people and especially towards the accused previous to the very time of the homicide. However, without considering whether the form of the objections aforesaid has at all narrowed the scope of the legal questions raised, we shall proceed to consider the whole subject.

[8] We will say at the outset that it is well settled that the statements in a dying declaration, consisting merely of the state of feeling of the declarant towards the person who committed the homicide, is inadmissible in evidence. See 10 Am. & Eng. Enc. L. (2d ed.), p. 384. But this is not because the state of feeling between such parties leading up to and at the time of the homicide is immaterial or irrelevant, for it is decidedly material and relevant. The reason for this rule is that the accused must be tried for his deeds in the light of the situation as it reasonably appeared to him from the outward conduct and demeanor of the deceased, and not in the light of the secret state of feeling existing on the part of the deceased. However, plainly, as we think, the declarations involved in the instant case are not of a mere state of feeling between the declarant and the accused, but of outward conduct of the former towards the latter and towards another person.

Coming now to the further consideration of the subject in hand, the following should be said:

As we know, the ancient rule against the admission in evidence of statements of conclusions of fact has been much relaxed in modern times.

As said in 10 Am. & Eng. Ency. L. (2d ed.), p. 383: "A statement which tends to show whether there was any provocation for the defendant's act may be so worded as to be admissible. It has, however, been held that the general statement that there was no cause for the defendant's act is not admissible." (Citing Kentucky and Missouri cases.) "But some courts have taken the contrary view." (Citing Ohio, Mississippi, Texas, Indiana, Georgia, California, Iowa, Alabama, and North Carolina cases.)

An examination of the cases discloses that in Kentucky and Missouri it is held that the dying declarations which are admissible in evidence are those confined to the topic of the facts which occurred at the very time of the killing; and it is also held in these two States that statements of the declarant of conclusions of fact are inadmissible in evidence because violative of the rule against opinion evidence of non-expert witnesses. *Starr* v. *Com.*, 97 Ky. 193, 30 S. W. 397; *Collins* v. *Com.*, 12 Bush. (Ky.) 271; *State* v. *Elkins*, 101 Mo. 344, 14 S. W. 116; *State* v. *Parker*, 172 Mo. 191, 72 S. W. 650. (It may be noted that in the note to section 1434 of 2 Wigmore on Ev., *supra*, the holding of the last cited case is severly criticized.) The Kentucky and Missouri holding is, as we think, contrary to principle and the greater weight of authority, certainly in so far as it confines the topic to the facts which occurred at the very time of the homicide. The "facts leading up to," and hence which precede the homicide, which have a material bearing upon the motives and the probable conduct of the accused at the time of the homicide, are relevant, and dying declarations concerning such facts are plainly

admissible upon principle and according to the greater weight of authority. There is force in the position taken in the Missouri case of *State* v. *Elkins,* to the effect that the opportunity for cross-examination of a witness on the stand furnishes a safeguard against untrue general statements of conclusions of fact which is absent in the case of the admission in evidence of a dying declaration; but the same consideration of necessity (which is the foundation of the rule excepting dying declarations from the rule against hearsay evidence) operates in favor of admitting in evidence dying declarations of conclusions of fact, as operates in favor of admitting such declarations of specific facts. The declarant most often, indeed, is *in extremis,* and so not in a physical condition to state occurrences in detail, but only conclusions of fact, and, so far as truth is concerned, the sanction afforded by the sense of impending death, without any expectation or hope of recovery, would seem to constitute an equal guaranty of the truth of both character of statements. With respect to unintentional errors in statements of fact, they may, it is believed occur at least equally as often, if not more frequently, in statements of detailed occurrences, than of conclusions of fact. The trial jury is charged with and seldom fails to perform the duty of making the proper allowance for such errors of statement. The dying declaration is not admitted as evidence, which is true, but only for the consideration of the jury for what it may consider it worth in the light of all the other evidence and circumstances in the case.

[9-11] The true principle would seem to be that the dying declaration is not inadmissible in evidence merely because it states a conclusion of fact, but to be admissible it must refer to a fact or facts which are relevant and which, if they do not attend the very time of the homicide, or concern the cause of the death, are so nearly antecedent in time as that it may be reasonably considered that they tend to show

the motive and probable conduct of the accused at the time of the homicide, which are in issue in the case.

*Patterson's Case,* 114 Va. 807, 75 S. E. 737, is strongly relied on for the accused. And it must be admitted that there are expressions in the opinion in that case which might bear the construction that dying declarations to be admissible must be confined in their scope to the occurrences at the very time of the homicide; and that declarations concerning transactions prior in date to the homicide itself are inadmissible in evidence, although in a dying declaration, however, relevant as leading up to and disclosing the animus or evidencing the probable conduct of the accused at the time of the homicide. We cannot think, however, that such a meaning was intended. The meaning contended for on the part of the accused is derived by giving to the phrase in the opinion, "circumstances of the transaction itself," the meaning of *res gestae* in its strictest sense, which indeed has been adopted in connection with the subject by the Kentucky and Missouri courts as aforesaid. Such a restricted meaning does not seem to us, as aforesaid, to be in accord with principle or the greater weight of authority. And, if the expressions in the opinion of this court in the *Patterson Case* can be construed to have the meaning contended for for the accused, they are hereby disapproved. What we are satisfied, however, is meant in that opinion by the phrase "circumstances of the transaction itself" are the circumstances, or facts, leading up to, or causing, or attending the homicide, any of such things being "circumstances of the transaction itself" in the correct meaning of that phrase as used in connection with the doctrine of dying declarations.

In the *Patterson Case,* the declaration was held to be inadmissible as a dying declaration, for the reason that it was not made under a sense of impending death without any expectation or hope of recovery, hence what was said in the

opinion with respect to the essential character of dying declarations to be admissible in evidence was not necessary for the decision of the case and doubtless the court did not give the subject as mature consideration as it would have done had the case turned upon that issue. Moreover, the opinion does not designate what portions of the declaration there involved were considered as parts and what as not parts of "the circumstances of the transaction itself," that is to say, of the circumstances relevant to the issues involved in the case. Patterson claimed that the deceased, Campbell, threw rocks at him and was in the act of taking up a large rock to throw again when he, Campbell, the accused, shot the deceased in self-defense. The whole declaration of the deceased, as made shortly prior to his death, was testified to by a witness as follows: "When I got back to Campbell  *  *  * I told him what Patterson said about him throwing rocks, and Campbell said that there had been no trouble between him and Patterson, and he asked me whether Patterson said that he had thrown any rocks. Says he, 'Did he say that?' and Campbell then said  *  *  * that he never had any trouble with Patterson, *only at the spring on the mountain, and that Patterson said he had eight feet of his land and must put the fence back, and that Patterson ripped out an oath and refused to speak to him.* Campbell said there had been no trouble between them, and that Patterson shot and killed him for nothing; that Patterson said, 'God damn you, don't you come through my gate or I will blow your brains out!' And Campbell said that he hoped he would die that minute if he threw a rock, that whether Patterson's nerve failed him or not he did not know, but that he dropped the gun from his head and shot him in the leg. When I went back after the arrest, he said  *  *  * *that he never had mistreated Patterson's daughters—respected them as his own.*" (Italics supplied.)

Those portions of the declaration which we have itali-cized seem to have had reference to distinct transactions, not leading up to or in any way connected with the conduct of the accused at the time of the homicide, so as to have any evidential value as to his motive or probable conduct on the occasion of the homicide. If these were the only por-tions of the declaration referred to in the holding in the opinion on the subject, we consider the holding sound, in view of the issues of fact in that case. And we do not un-derstand that the court meant to hold that any of the other declarations, though some of them were in the form of gen-eral conclusions of fact, were inadmissible in evidence.

Before we pass from the *Patterson Case,* this further, however, should be said. The following expression is relied on in argument for the accused in the case before us, which occurs in the opinion in the *Patterson Case,* at p. 816 of 114 Va., at p. 740 of 75 S. E., namely: "The absence of any self-serving purpose to be furthered on the part of the declarant is an essential element of the circumstan-tial guarantee of the trustworthiness of dying declara-tions. 2 Wigmore on Ev., sec. 1443." This is evidently an inadvertent expression in the opinion. It is not sup-ported by 2 Wigmore on Ev., sec. 1443, cited, nor have we been able elsewhere to find any authority sustain-ing such position. Nor can it be correct on principle, since for the most part dying declarations of deceased persons put in evidence by the Commonwealth, and universally held to be admissible, in accordance with the established doc-trine on that subject, are exculpatory of the deceased and inculpatory of the accused, and so must be said to have a self-serving purpose. This expression in the opinion in the *Patterson Case,* and what is said on the same subject in the next following paragraph therein, is hereby disapproved.

The following decisions in other jurisdictions show the trend of the great weight of authority on the subject under consideration:

In *Wroe* v. *State*, 20 Ohio St. 460, the declaration of the deceased held admissible was that the shooting "was done without provocation on his part." The court said: "Whether there was provocation or not is a fact, not stated, it is true, in the most elementary form of which it is susceptible, but sufficiently so to be admissible as evidence."

In *Payne* v. *State*, 61 Miss. 161, the declaration of the deceased was that the defendant "shot him without cause." In the opinion, referring to dying declarations, this is said: "Such declarations are  *  *  *  restricted to a statement of facts, and opinions, and inferences are to be excluded, but the dying declaration admitted in this case was of a fact and not an opinion or inference of the declarant."

In *Pierson* v. *State*, 21 Tex. App. 14, 17 S. W. 468, the declaration was: "They had no occasion to shoot me. I had not spoken to them a word, nor had I done anything to either of them." The court, at p. 59 of 21 Tex. App., at p. 470 of 17 S. W., said: "The statement that 'they had no occasion to shoot me,' was not a mere inference or opinion of the wounded man and inadmissible on that account." The opinion then cites with approval the cases from Ohio and Mississippi next above cited.

In *Roberts* v. *State*, 5 Tex. App. 141, the declaration admitted was that "Steve Roberts had killed him for nothing." Held: "This states a fact beyond opinion, and is admissible."

In *Boyle* v. *State*, 97 Ind. 322, the declaration was in the form of the following question and answer:

"Q. What reason, if any, had the man you have identified for shooting you?

"A. Not any that I know of."

Held: "Admissible as evidence, being the statement of a fact and not an opinion." Citing *Wroe* v. *State*, and *Roberts* v. *State*, *supra*, and other authorities to the same effect, with approval. .

In *Darby* v. *State*, 79 Ga. 63 S. E. 663, the declaration of the deceased was that the defendant "had cut him and that

he had done nothing to cause it." The court said: "It was objected that this was a conclusion. It seems to us that it was a question of fact whether he did anything or not. It is an every day occurrence to ask witnesses in court what the parties did, and for a reply to be made that one of the parties did a certain thing and the other did nothing. We do not think there is anything in that ground." The declaration was held to have been properly admitted in evidence.

In *State* v. *Mace*, 118 N. C. 1244, 24 S. E. 798, the declaration held admissible in evidence was "Oh, Lord! They have murdered me for nothing in the world."

In *Sullivan* v. *State*, 102 Ala. 135, 15 So. 264, 48 Am. St. Rep. 22, the court laid down the general rule confining dying declarations which are admissible in evidence to the topic of the facts which occurred at the very time of the killing, with all the strictness of the Kentucky and Missouri rule, and yet held that the dying declaration involved in that case, which was, "Jim Sullivan cut me; he cut me for nothing; I never did anything to him," was admissible in evidence. The court said: "The objections made to this testimony were that it was the conclusion of the declarant— the opinion of the deceased—and that it did not relate to the circumstances or transactions of the killing. There is nothing in this objection. The statement certainly did relate to the act or transaction of the killing. * * * He * * * said Sullivan cut him for nothing, and that he, the declarant, did nothing to Sullivan. True this statement was very general, but it was admissible as a collective fact."

In *Bull's Case*, 14 Gratt. (55 Va.) 613, the declaration was that the prisoner "struck and killed the deceased without provocation, and for no cause, except that the prisoner and those who joined him in the affray said the deceased had talked about a young lady in Haley's house, which the deceased said he had never done." It is true that no objec-

tion was made in that case to the character of this statement, so far as appears from the report of the case, the question raised and decided by the court therein concerning only whether the declaration was made when the declarant was under a sense of impending death and without any expectation or hope of recovery. The declaration was held to be admissible in evidence, however, without any question being even raised by counsel against its admissibility because of its statements of general conclusions of fact or because those facts were not expressly confined to the occurrences at the very time of the homicide.

Coming now to a more specific consideration of the dying declarations remaining to be disposed of in the case before us, our conclusions are as follows:

[12] Since the relations of the deceased with the accused and Daisy Moss, which were in question, consisting of their conduct toward each other, had existed only for a few · weeks prior to the homicide, we think that the conduct of the deceased towards the accused and Daisy Moss during the whole of that time may be fairly said to have been relevant and hence admissible in evidence as a part of the circumstances leading up to the homicide; certainly at the time the dying declaration was introduced, when the accused was being tried on the charge of murder, and his testimony had not come in limiting his defense to the narrow one of self-defense only. In fact, both the Commonwealth, without objection on the part of the accused, and the accused, introduced the testimony of a number of witnesses concerning such relations during the whole of this time. We perceive no good reason why the dying declarations of the deceased on the same subject were not as properly admissible in evidence as the other testimony just referred to. If the deceased had lived and been testifying as a witness in the case, his testimony to the same effect as the declarations now under consideration would have been un-

questionably properly admissible in evidence. Therefore, while abstractly speaking, portions of these declarations were too unlimited as to time antecedent to the homicide to be admissible in evidence as dying declarations under the correct rule on the subject, practically, as applied to the facts of the instant case, they could have had no reference to any longer time than the few weeks of the association of the deceased with the aforesaid parties. Hence, upon principle, and under the holding of the weight of authority above referred to, we are of opinion that such declarations were properly admitted in evidence.

[13] 3. It appears from the record that Daisy Moss was not sent before the grand jury who indicted the accused, because "she stated that she did not know anything;" that she was summoned as a witness for the Commonwealth to attend the trial of the case, and upon the entering upon the trial of the case the Commonwealth moved the court to introduce Daisy Moss as a court witness on behalf of the Commonwealth, she being the first witness, no other witness having been introduced, and the attorney for the Commonwealth further moved the court to be permitted to cross-examine the said Daisy Moss, stating to the court as the ground for such action that the attorney assisting the attorney for the Commonwealth in the prosecution had not had an opportunity to talk with this witness, although he had been at her home for that purpose, and "she had refused to talk to anyone before the trial." Thereupon the court, over the objection of the accused, granted the motions of the attorneys for the Commonwealth, and accordingly introduced Daisy Moss as a court witness, and the court proceeded to examine and did examine her as a witness. After she had been so examined by the court, "the witness showing great reluctance to testify," as is certified in the record, the attorneys for the Commonwealth were permitted by the court, over the objection of the accused,

to cross-examine the witness as a hostile witness and to ask her many leading questions. And the question is presented for our decision as to whether said action of the trial court was error?

This question must be answered in the negative.

Section 6214 of the Code of 1919 provides as follows: "A party called to testify for another, having an adverse interest, may be examined by such other party according to the rules applicable to cross-examination."

As held in *Gordon* v. *Funkhouser*, 100 Va. 825, 41 S. E. 746, 57 L. R. A. 744, although it be not shown that a witness has an adverse interest, if it appears that the witness is in fact adverse, the statute is applicable.

Under the circumstances above narrated, we think that there was no error in the action of the trial court stated. That action amounted in substance to no more than to allow the witness, who was in fact adverse, to be examined as an adverse witness under the statute.

It is urged for the accused that for a witness to be introduced as a court witness is not in accordance with the practice in Virginia; and *Blackwood Coal Co.* v. *James,* 107 Va. 656, 60 S. E. 90, is cited in support of that position. That was a civil case, in which the court, at 707 Va. p. 659, 60 S. E. at p. 93, said this: "So far as we are advised, it has not been the practice in this State for the court, of its own motion, to call a witness in a civil case; but it is not necessary, in this case, to consider or decide upon the right of the court to call the witness in question."

We are of opinion that in a criminal case, under the circumstances above stated, the court has the right, in the exercise of a sound discretion, to call the witness, as was done in the instant case, and that there was no error in the action of the trial court under consideration.

[14] But one other question remains for our decision, and that is this:

45

4. Did the court err in permitting the attorneys for the Commonwealth to cross-examine the witness Frances Ranson, after introducing such witness as a Commonwealth's witness and examining her in chief as such a witness?

The trial court certifies as a fact that this "witness had shown on her examination in chief by her demeanor and her answers that she was a hostile witness," and on that ground permitted the attorneys for the Commonwealth to cross-examine her.

We are of opinion that the statute next above cited is applicable and fully authorized such action of the court. Hence, we find no error in such action.

The judgment under review will be affirmed.

*Affirmed.*