# Richmond.

## GROVER REYNOLDS v. COMMONWEALTH.

### January 18, 1923.

1. HOMICIDE—*Murder in Second Degree or Involuntary Manslaughter—Sufficiency of the Evidence—Case at Bar.*—In the instant case, a prosecution for homicide, accused testified, and his testimony was corroborated by others, that when he shot deceased, a boy sixteen or seventeen years of age, weighing about 125 to 135 pounds, deceased was intoxicated and advancing upon him with a shovel; that he thought deceased aimed to kill him; that he pointed a gun at deceased aiming to scare him off, and in his excitement pulled the trigger and shot him. Testimony for the Commonwealth was to the effect that accused had stated to his employer immediately after the homicide that he had shot deceased accidentally, and when asked "Where he had shot him? In the foot? To which the accused replied: 'I think so. I aimed to shoot him in the foot.'" Deceased's dying declaration was that accused had shot him, and had done so without any cause.

   *Held:* That the evidence was insufficient to support a verdict of murder in the second degree.

2. DYING DECLARATIONS—*Admissibility—Conclusion of Deceased—Declaration that Accused Killed Deceased Without Cause.*—A dying declaration that accused killed deceased without cause is admissible.

Error to a judgment of the Circuit Court of Patrick county.

*Reversed and remanded.*

The accused was indicted and tried for the murder of one Roy Mitchell. He was found guilty of murder in the second degree and sentenced to eight years confinement in the penitentiary in accordance with the verdict of the jury.

The deceased, about sixteen or seventeen years old, weighing about 125 to 135 pounds, was shot in the abdomen by a shotgun in the hands of the accused, on a

certain night in November, 1921, causing his death in a few hours thereafter.

The only evidence for the Commonwealth, in addition to that showing the age and size of the deceased aforesaid, was to the following effect:

About midnight, of the night of the homicide, the accused came to the home of a Mr. Price, by whom the deceased had been employed for some time, called Mr. Price and asked him to come to the home of the accused (at which the deceased was living) "and see what could be done for Roy Mitchell, that he had been shot." Mr. Price asked the accused "who had shot him, and he said he had done so himself. He said that he had shot him accidentally." Mr. Price asked the accused "where he had shot him? In the foot? To which the accused replied: 'I think so. I aimed to shoot him in the foot'." Mr. Price went to the home of the accused and found Roy Mitchell lying on the bed apparently suffering intensely from the wound. He told Mr. Price that he realized that he could not live very long and Mr. Price asked him who shot him. He replied that "Grover Reynolds" (the accused) "shot him and had done so without any cause."

The attending physician arrived after this. The latter testified that the aforesaid wound caused the death of the deceased; that he died about an hour and a half after his (the physician's) arrival; and that, knowing that death was impending, the deceased made to him the following statement, to-wit: "Man say go to bed (Grover Reynolds), God-damn you, I will kill you; started to bed; stopped to tell the missus good night; he shot me." That later the deceased called the physician back and said: "Licker in kitchen."

The coroner also testified that the aforesaid wound was the cause of the death of the deceased.

The testimony of and for the accused was to the following effect:

The accused testified that he and the deceased were good friends until the night that he killed the deceased; that, prior to the killing, he and the deceased went to the home of Robert Tatum to a corn shucking; that they took a few drinks and went home to find the family gone to bed; that they arrived there between ten and eleven o'clock; that the accused built a fire and he and the deceased sat by it for some time talking; that the deceased was "intoxicated to some extent;" that he told the deceased that he was going to bed, and for the deceased to do likewise, which the deceased refused to do; that he again admonished him to go to bed, and thereupon he became angry and talked very roughly to the accused; that finally the accused left the room for a moment, and when he returned, the deceased was standing by the bed of the accused's wife, and, upon being asked what he was doing, he said he was telling the madam good night.   The accused further testified that he again told the deceased to go to bed, when the deceased picked up a fire shovel and started towards him; that the accused backed away from the window to the opposite side of the room, and the deceased followed him, and when the accused could retreat no further, he picked up his gun (from the place he usually kept it) and told the deceased to come no further; that, as the deceased continued coming with the uplifted shovel, the accused remembered that he "cocked the gun and it went off."

The accused testified that he thought the deceased aimed to kill him with the shovel, which "was a big, heavy, iron shovel that could kill most any one if you tried."

The accused testified that he pointed the gun at the

deceased, "aiming to scare him off," and in his "excitement pulled the trigger and shot him;" that he immediately went to the home of Mr. Price, for whom the deceased worked, and told him what he had done, and went to his mother's and afterwards to Stuart, to give himself up to the sheriff.   He stated that he would not have shot the deceased but for the fact that he feared being killed by the deceased with the shovel.

The wife and daughter of the accused testified practically to the same circumstances.

Several witnesses were introduced to show that the relationship between the accused and the deceased was a friendly one.

Price testified that when he reached the home of the accused the shovel was sitting by the fireplace.

Anna Reynolds, a daughter of the accused, testified that when the deceased fell the shovel dropped out of his hand, and she later picked it up and "chunked the fire with it" and left it sitting by the fireplace.   The wife of the accused testified to the same effect.

*W. L. Joyce*, for the plaintiff in error.

*John R. Saunders, Attorney-General, J. D. Hank, Jr., Assistant Attorney-General*, and *Leon M. Bazile, Second Assistant Attorney-General*, for the Commonwealth.

SIMS, J., after making the foregoing statement, delivered the following opinion of the court:

In the view we take of the case, we need to consider only one question raised by the assignments of error and that is this:

[1, 2]  1.  Was there sufficient evidence to support the verdict of the jury?

The question must be answered in the negative.

There is absolutely no evidence which could be even argued as being in conflict with the testimony of and for the accused, except the dying declaration of the deceased that the accused shot him "without any cause," and the testimony of Mr. Price to the effect that the accused said that he thought he had shot the deceased in the foot, that he "aimed to shoot him in the foot." As held in *Pendleton's Case*, 131 Va. 676, 109 S. E. 201, the dying declaration was admissible in evidence, but the sufficiency of such a declaration, when standing alone, to sustain a verdict finding the accused guilty of murder is another matter, and especially in a case in which all of the other evidence, to say the most of it, in favor of the Commonwealth, points only to involuntary manslaughter. And it would be only upon the theory that the shooting was not actually or apparently necessary by the accused in self-defense, because the youth and size of the deceased was such that the accused could have protected himself without resorting to the use of the gun, that he could be found guilty of involuntary manslaughter. We say this because, even if, upon the theory just mentioned, the resort to the gun was neither actually nor apparently necessary, yet the shooting would have appeared to the deceased as having been without any justifiable cause; and that the shooting was without justifiable cause as it appeared to the deceased, is all that his dying statement can be said to have meant. Such statement, therefore, is entirely consistent with the evidence tending to show that the shooting was accidental, and, at most, the result of the unnecessary and careless use of the shot-gun. This might constitute the offense of involuntary manslaughter, but no greater offense, under the circumstances of this case.

The statement of the accused to Mr. Price that he aimed to shoot the deceased in the foot, accompanied his statement to the same witness that the shooting was accidental, and is in entire accord with the statement of the accused in his testimony on the trial that he "pointed the gun at him aiming to scare him off and in my (the accused's) excitement I pulled the trigger and shot him."

There is an entire absence of any evidence in the case tending to show that the accused or his witnesses swore falsely; or that there was, on the part of the accused, any old grudge, or actual malice, or constructive malice, due to the deliberate use of the weapon; or other conduct of the accused inconsistent with the defense which he made upon his trial.   There was nothing in the character of the wound which was in conflict with the testimony of and for the accused.

Therefore, as it seems to us, all of the evidence in the case is consistent with the theory that the shooting was accidental and not the result of any intentional wrongdoing.   Hence, we are of opinion that there was not sufficient evidence to sustain the verdict finding the accused guilty of murder.

The case will be reversed and a new trial awarded.

*Reversed and remanded for a new trial.*